UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JEFFREY L. HORTON,

                              Petitioner,

        v.                                                      9:22-CV-0382
                                                                (MAD)
G. JONES, Superintendent,

                              Respondent.

_____

APPEARANCES:                                        OF COUNSEL:

JEFFREY L. HORTON
Petitioner Pro Se
16-B-2171
Marcy Correctional Facility
P.O. Box 3600
Marcy, New York 13403

HON. LETITIA JAMES                                  PRISCILLA I. STEWARD, ESQ.
Attorney for Respondent                             Ass't Attorney General
New York State Attorney General
The Capitol
Albany, New York 12224

MAE A. D'AGOSTINO
United States District Judge

## DECISION and ORDER

## I.      INTRODUCTION

        Petitioner Jeffrey Horton seeks federal habeas relief pursuant to 28 U.S.C. § 2254.

Dkt. No. 1, Petition ("Pet."); Dkt. No. 2, Exhibits; Dkt. No. 3, Memorandum of Law in Support.[1]

---

[1]  For the sake of clarity, with two limited exceptions, citations to all parties' filings refer to the pagination generated by CM/ECF, the Court's electronic filing system.  However, citations to the State Court Record ("SCR"), Dkt. No. 20-2, and State Court Transcript ("T.") and Sentencing ("S."), Dkt. No. 19 (which were filed under seal), reference the Bates-stamp at the bottom-center of each page and the upper right-hand corner, respectively, as each exhibit is separately and consecutively paginated.

Respondent opposed the Petition.  Dkt. No. 20, Response; Dkt. No. 20-1, Memorandum of Law in Support; Dkt. No. 20-2, State Court Records.  Petitioner filed a reply.  Dkt. No. 26, Traverse.  For the reasons which follow, the Petition is denied and dismissed.

## II.    RELEVANT BACKGROUND

### A.    State Court Criminal Proceedings

#### 1.    Indictment and First Trial

A Tompkins County grand jury initially charged petitioner with "a 15-count indictment with various crimes allegedly committed against his ex-girlfriend."  *People v. Horton*, 162 A.D.3d 1118, 1119 (3rd Dep't 2018) ("*Horton I*").  Following a jury trial in 2016, during which petitioner testified on his own behalf, the jury convicted petitioner on eleven of the counts.  *Id.* Petitioner directly appealed the conviction and sentence, and, on June 7, 2018, the New York State Appellate Division, Third Department, reversed the conviction because the trial court erred in denying petitioner's for-cause challenge to a prospective juror.  *Id.* at 1120-21.  The matter was then remitted for a new trial.  *Id.* at 1121.

#### 2.    The Amended Bill of Particulars

Prior to the first trial, petitioner made a demand for a bill of particulars, seeking, amongst other things, the information that the prosecution intended to use as proof about how petitioner entered the victim's home.  SCR at 435.  In response, the People stated that "[t]he evidence indicates the [petitioner] climbed through the doggy door into the garage and then proceeded into the residence."  *Id.*

Prior to the second trial, and pursuant to New York Criminal Procedure Law § 200.95(8), the prosecution filed an amended bill of particulars.  SCR at 420-28.  The amended bill of particulars indicated that the mode of entry into the victim's home was

2

> Not applicable to a Bill of Particulars.  The People have no
> obligation to provide "matters of evidence relating to how the
> People intend to prove the elements of the offenses charged or
> how the People intend to prove any item of factual information in
> the bill of particulars."  *See* [N.Y. CRIM. PRO. LAW §] 200.95(1)(a).

SCR at 421.

Petitioner moved to strike the Amended Bill of Particulars, specifically with regard to the new answers provided about how petitioner had entered the victim's home.  SCR at 415-17.  The trial court denied the motion.  T. 17-19.

### 3.    The Second Trial

#### i.    The Prosecution's Case

The facts which follow were based on the testimony offered by the prosecution.  In March of 2015, the victim was living in Dryden, in a home she owned and shared with her two children and her dog.  T. 674-76.  Petitioner and the victim had been dating between August 2014 and March 2015, and the victim's testimony relates to the final tumultuous days of their relationship.  T. 676.

On March 20, 2015, petitioner went to the bar where the victim worked and accused the victim of having an affair with a coworker.  T. 685.  The victim told the petitioner that their relationship was over, and petitioner left the bar.  *Id.*  Later that evening, petitioner entered the victim's home, with a key she had previously given him; threw said key at the victim; announced their relationship was over; and began calling the victim disparaging names.  T. 687.  The victim locked herself in the bathroom while petitioner gathered his belongings from her home.  T. 688.  A few days later, on March 23, 2015, petitioner delivered the victim a letter, asking for a peaceful truce and termination to the relationship.  T. 707-09.

The next day, on March 24, 2015, petitioner came into the victim's home, uninvited, in an emotional state saying that not being together was killing him.  T. 711-12, 767.  The victim stated that she was doing well and did not want to have any further communication or contact with the petitioner.  T. 712.  Petitioner asked if he could take the victim out to dinner and she declined, directing petitioner to leave her home and stay away from her.  T. 713.

Later that night, the victim was with her friends at the bar when the petitioner, his sister, and the sister's boyfriend arrived.  T. 713-16.  Valerie Beckley, the bartender that evening and the victim's friend, refused to serve the petitioner's group, so the trio left the bar shortly thereafter.  T. 718-17, 889.  A few minutes later, a police officer arrived at the bar after petitioner had placed a 911 call; however, Beckley met the officer outside of the bar and he never entered the establishment.  T. 717-18, 890.

The victim stayed with Beckley until closing, and then Beckley and the victim switched cars to drive home, because the petitioner "had made [the victim] very nervous[.]"  T. 719-20, *see also* T. 894.  Beckley met the victim at her home, where both women were receiving constant text messages and phone calls from the petitioner, to make sure that the victim was home safely and everything was locked and secured.  T. 720-21, T. 895-96.  Other than her dog, the victim was home by herself because her children were at their father's house.  T. 736.  At around 10:00 P.M., the victim then shut off her phone and went to bed.  T. 721-22, 736.

The victim was briefly awoken later by the sound of her dog barking, and then by the petitioner turning on the light in her bedroom.  T. 737.  Petitioner had again entered her home, without her permission, and she asked how he had gotten in and what he was doing

there.  T. 737.  Petitioner told the victim she "didn't lock the laundry room door," and that he initially entered the home "through the doggy door."  T. 737.

Petitioner then began physically and verbally attacking the victim by telling her to shut up, ripping the blanket off her bed, mounting himself on top of her, and hitting her head and face while she pleaded for him to stop.  T. 737.  Petitioner then flipped the victim from her back to her stomach and secured her arms behind her back with a blue nylon pet leash that was given to the victim once when she took her dog to the veterinarian.  T. 737-38.[2]  The victim continually screamed at the petitioner, telling him to stop and that he was hurting her, and the petitioner continued to tell her to shut up.  *Id.*  The victim stated that she was "absolutely petrified", and that the petitioner was red in the face and snarling at her.  T. 738.

The victim could hear the petitioner undressing as he announced that now the victim was "gonna get it.  [The petitioner] just wanted to talk to [the victim] and now [she was] gonna get it."  T. 739.  Petitioner also announced that he had taken two Viagara on the way to her home and, striking the victim in her "head, face, [and] ears," petitioner grabbed the lubricant from her nightstand and began to masturbate and insert a vibrator into the victim's anus.  T. 740.  The victim continued to cry, yell, and tell the petitioner that he was hurting her, and the petitioner continued to instruct her to shut up.  T. 741.[3]  The victim explained that at this point her "head was hurting.  [Her] ears were ringing.  [Her] face was starting to hurt because [the petitioner] had hit [her] . . . and [she] just was absolutely petrified."  T. 742. Further, her dog had come into the bedroom while the victim was yelling, and the petitioner threatened that if the victim couldn't get the dog to leave he was "going to kill [the dog] in front of [the victim.]"

---

[2]  The victim testified that she knew petitioner got the leash from her laundry room, when he entered her home, because she "looked for it the next day and it wasn't [in the drawer in the laundry room]," and she never found it again.  T. 739.
[3]  The victim made is absolutely clear that she did not give petitioner permission to enter her home, restrain her, strike her, or have any kind of physical or sexual contact with her on the night of the attack.  T. 767-68.

T. 743.  When the petitioner finished, he went into the bathroom.  T. 742.  The victim took the opportunity to loosen the ropes to free herself and roll onto her back.  *Id.*

When the petitioner returned to the bedroom, he jumped back on top of the victim.  T. 743.  However, the victim hit the petitioner in the face and went to swing at him again, when the petitioner bit her finger.  T. 744.  The petitioner then struck the victim a few more times in the head and face before flipping her back on to her stomach and again securing her hands behind her back with the nylon leash.  *Id.*  Once her hands were secured from her elbows to her wrists, the petitioner flipped the victim from her stomach to her back so he could vaginally penetrate her with the vibrator.  *Id.*  The victim began crying, and petitioner was unable to get an erection, so he flipped the victim back on to her stomach where he unsuccessfully attempted to penetrate her anus with his penis.  T. 745-46.  Petitioner then partially inserted his penis into her vagina and threatened to kill the victim if she tried to kick him.  T. 745-46.

After the attack, petitioner commented that the victim's face looked awful and got her an ice pack.  T. 747-48.  Petitioner then began pacing in the bedroom and contemplated killing himself or turning himself in to the authorities.  T. 748-49.  Petitioner asked the victim not to tell the police "about the rope and the sexual [assault because the petitioner said he] could go away for a long time."  T. 749.

Petitioner eventually untied the victim, put the leash in his coat pocket, and left to go to the state trooper's barracks around 1:00 A.M.  T.749.  Petitioner asked the victim not to call anyone for twenty minutes to give the petitioner time to turn himself in.  *Id.*

After petitioner left, he spoke with Sergeant Marinelli at the New York State Police.  T. 904-05.  Marinelli met petitioner in the lobby, where the petitioner reported that he had a domestic dispute that had turned physical.  T. 906.  Petitioner told Marinelli that "he wanted to

turn himself into the Ithaca barracks, [since he] figured [the State Police] would be coming to look for him eventually," since the victim "had bruises on her and he thought she was hurt." T. 906.  Petitioner reported that he had been at the victim's home from about 11:45 P.M. to 1:15 A.M. the following day.  T. 907-08.  Petitioner was placed under arrest, and he was read his rights.  T. 907-08.

Petitioner then called the victim's cell phone to tell her he was at the police station, and that he thought someone was headed to the victim's house to speak with her.  T. 750-51. The victim waited a little while and then called 911 herself.  T. 751.

A Dryden Police Officer, Joshua Tagliavento, responded to the victim's 911 call.  T. 752-53.  Tagliavento initially observed that the victim had been crying, her face was red, and her face was very swollen and bruised.  T. 921.  The victim stated "that [her] ex-boyfriend just beat the shit out of [her]."  T. 921.

While an ambulance was also dispatched, the victim declined going to the emergency room and, instead, accompanied Officer Tagliavento to the police station to give a statement. T. 753, 922-23.  In addition to her statement, the officer also took pictures of the victim and again encouraged her to go get evaluated at the emergency room.  T. 754, 923-24.  The victim declined and returned home.  T. 754.  The victim explained that she was not totally honest in the statement that she provided the officer, as she "was . . . appalled and petrified. [She] did not speak of the rope or the sexual assault that night.  Just that [petitioner] beat [her] up."  T. 753-54.

The following morning, on March 25, 2015, the victim sought medical attention at Cortland Regional Medical.  T. 755.  She, again, did not tell the medical personnel there that she had been sexually assaulted, and instead received treatment for her swollen and bruised

face, ringing ears, and pounding headache.  T. 755.  Petitioner was prescribed ibuprofen and

hydrocodone pain killers.  T. 756.

That same day, petitioner provided a voluntary statement to Tagliavento.  T. 926.  It

said that petitioner and the victim

> [h]ad a disagreement earlier in [the] night and [petitioner] went
> over to smooth things over.  [The two t]alked a little, then [an]
> argument ensued.  [The victim] punched or slapped [petitioner] in
> the mouth and [petitioner] slapped or hit [the victim] in the face a
> few times.  [Petitioner r]ealized [he] was wrong and turned
> [him]self in to the State Police voluntarily . . . [Petitioner d]eeply
> regret[s his] actions for the night. . . . [Petitioner e]ntered through
> [an] unlocked door in the back, which [he had] done . . . several
> times before.

T. 944.

On March 26, 2015, the victim prepared an uncensored written account of the entire

attack and showed it to John Barber, the Ithaca Police Chief, who is a relative by marriage.

T. 758-59.  Pursuant to Barber's advice, the victim returned to the Dryden police station and

provided the additional statement to Officer Tagliavento.  T. 759, 944.  Tagliavento also took

additional pictures of the victim's facial injuries because "they had time to darken, and

everything was very distinct at that point."  T. 945.

The victim was then examined by her primary care physician, Dr. Ruth Crepet, on

March 26, 2015.  T. 759-60, 823.  The victim presented with complaints of a severe

headache, ringing in her ears, and dizziness after being hit in the face several times.  T. 761,

823, 825.  Dr. Crepet noted that "[o]n examination, [the victim] had bruising of the face and

around the ear area and even inside the ear," which corroborated the victim's story that she

had been hit as she stated.  T. 824.  The victim was given a few different prescription drugs

and instructed that she was not permitted to return to work.  T. 762, 826.

The victim was also examined by Deb Scott, a sexual assault nurse examiner ("SANE"), on March 26, 2015.  T. 760.  The victim reported that "she had been tied up, that she had been slapped, that she had been bitten.  She had been anally and vaginally penetrated [and s]he had been beat up severely."  T. 851-52.  The victim also shared that she had showered the morning before the exam.  T. 761.

Scott observed that the victim was covered in numerous bruises and had a bite mark, as well as a linear red mark on her wrist.  T. 853-54, 866, 871.  Specifically, bruising was noted over the victim's scalp, forehead, eye, lip, chin, jaw, ear, left hand, knee, hip, and buttocks.  T. 863-872.  No bruising was noted in the victim's genital area, Scott explained that it is difficult to view trauma in the anus or vagina "[b]ecause the[y] . . . are generally . . . well-lubricated areas so it heals well and quickly, especially when it's kept clean[;]" consequently, any trauma that occurs in the genital area can disappear within hours of its infliction.  T. 883.  Scott concluded the even "if there [wa]s no injury observed upon visual inspection to the vagina or anus, [that] does [not] mean that the person was not sexually assaulted," and, given Scott's experience and the extent of the victim's injuries, Scott believed that the victim was sexually assaulted.  T. 876.

On April 10, 2015, the victim returned for a follow-up with Dr. Crepet where she was still not cleared to return to work due to her headaches and sensitivity to light and sound.  T. 762, 826-27.  The victim explained that her dizziness and nausea prevented her from completing her daily household chores.  T. 762-63.  Dr. Crepet continued to restrict the victim from work because "[a]t this time [the victim] was presenting with post-concussion symptoms, the dizziness, the light sensitivity, [and] the inability to concentrate."  T. 827.  Dr. Crepet went

on to formally diagnose the victim with post-concussion syndrome.[4]  T. 827.  Dr. Crepet also explained that the delay in diagnosis was not surprising because it can take some time for post-concussion symptoms to appear.  T. 828.

On May 5, 2015, the victim returned to Dr. Crepet again, and this time was cleared for light duty work.  T. 763, 829.  While the victim's overall health had improved, she was still suffering from headaches.  T. 763, 829.  These restrictions meant that the victim could not return to her normal work duties in the field.  T. 763, 830.

A few weeks later, petitioner was eventually cleared to return to work.  T. 754.  She had missed five to six weeks in total.  *Id.*

During the prosecution's case, there was also testimony from Officer Christopher Kane, a New York State Police Investigator with the computer crime unit.  T. 989.  Kane discussed how information was extracted from petitioner's cell phone and explained that what was found was web-based searches for "NY State Law Assault and Battery" and "Sodomy Laws" on March 24 and 26 respectively.  T. 1005-1029.  Further, there was a text message that was sent from petitioner's phone, on March 26th, to his sister that said "Do not tell a single person me and [the victim] made love last night.  I could be charged with rape.  Thanks."  T. 1031.

Further, the prosecution read in petitioner's testimony from his first trial.  T. 1048-1213.  Petitioner corroborated several aspects of the victim's story.  First, that he was an unwelcome guest in her home on March 20th and he ultimately threw his key at her and packed his things and left while she remained locked in the bathroom.  T. 1079-1098.  Petitioner then indicated

---

[4]  "Post-concussion syndrome is thought to be kind of a bruising to the brain, [a] minimal brain injury."  T. 827-28.  Dr. Crepet went on to explain the recommended treatment for post-concussive syndrome is physical and mental rest; however, pain medication is not contraindicated to manage the symptoms that accompany the syndrome.  T. 837.

that things seemed to improve, and then again deteriorate, with him sending the victim several angry and belligerent texts on March 22nd.  T.109-1102.  In an attempt to make amends, petitioner wrote and delivered a love letter to the victim's home.  T. 1102-05. Petitioner states this was not well-received, and the victim did not seem to be interested in reconciling.  T. 1105.

Petitioner also indicated that, after being denied service at the bar on March 24th, he made a report with 911.  T. 1108-1114.  When he left the bar that night, petitioner indicated it was clear to him that the victim no longer wanted him around and she was very upset with him.  T. 1115-16.

Petitioner admitted he continued to try to communicate with the victim via text messages that night, which made things much worse.  T. 1115-16.  Petitioner then decided to go to the victim's home, trying the gain entry through the front door – which was locked – and then walking around to the back of the home and entering through the back door – which he says was unlocked.  T. 1116-19.  Petitioner admitted that he had no possessory interest in the victim's home or permission to be there that night.  T. 1139, 1185.  Petitioner also admitted that he knew the victim did not want to see him, given her repeated instructions to leave her alone.  T. 1187.

Petitioner then went to the victim's bedroom "[t]o try and make things right;" however, upon waking, the victim was livid with the petitioner.  T. 1119-120.  When petitioner then went to kiss the victim good night, petitioner stated that the victim punched the petitioner, and he reacted by striking her and then jumping on top of her and slapping her repeatedly.  T. 1120-21.  Petitioner states that he pinned the victim down to prevent her from hitting him and admitted that his actions caused the bruising on her face.  T. 1121-22.

11

The petitioner testified that he was upset with himself for losing his temper and injuring the victim.  T. 1122.  However, when the petitioner went to leave, the victim seduced him and asked him to engage in various types of sexual intercourse with her, which they then consensually did.  T. 1123-27.  When they were done, petitioner apologized to the victim and, when he noticed the bruises that were forming on her face, went to get her ice.  T. 1127.  The victim looked at herself and said she was going to charge the petitioner with assault, which angered petitioner since it was, in his opinion, the victim who was the initial aggressor.  T. 1128.  Petitioner then said that the victim pressured him to turn himself in, knowing that the victim was intending to bring charges against him if he did not.  T. 1128-29.

Petitioner testified that he eventually went to the police barracks and admitted that he had engaged in a domestic dispute with his girlfriend, which had turned violent, and filled out a statement explaining as much.  T. 1131-33.  During petitioner's trial testimony, he admitted to causing the injuries to petitioner's chin, face and ears.  T. 1194-96.

Petitioner then addressed various text messages that he had sent to his sister on March 26.  T. 1135-36.  The first text, sent from petitioner, said "Do not tell a single person me and [the victim] made love that night.  I could be charged with rape.  Thank you."  T. 1135-36.  Petitioner then sent another, repeating "No one.  Already told [a third person] the same thing."  T. 1136.  Petitioner explained that he sent the message because he had met with his defense attorney who informed him that the victim was probably going to charge him with rape.  T. 1136.

Petitioner concluded by denying that he possessed a rope, restrained the victim, forced the victim to have either vaginal or anal intercourse with him, or used a vibrator on the victim against her will.  T. 1137-38.  In sum, petitioner testified that he entered the victim's

home that night, through the back door, to reconcile with her.  T. 1138.  Petitioner had no

intention of committing any crimes.  T. 1138.

### ii.    The Defense Case

The emergency medical technician who  provided the victim with treatment at her

home testified that the victim received a maximum score – correlating to the least severe

degree of injury – on the Glasgow Coma Scale, which measures "a person's eye movement,

their verbal communication, and their motor skills."  T. 1226-27.  However, the test has little to

do with physical injury and instead deals with cognitive function and the presence of a

traumatic brain injury.  T. 1230-31.

Two of the victim's friends also testified about their interactions with the victim after the

attack.  T. 1245-49.  The victim told the first that it was "very unfortunate what is going on,

[and] that [petitioner] was very good to her and her kids."  T. 1236.  The second saw the

victim a few weeks after the attack, at a restaurant, with several others, drinking and

presumably participating in a wine tour.  T. 1245-46, 1248-49.

Finally, a forensic serologist from the New York State Crime lab testified that there was

no sperm observed on the vibrator and no sperm or prostate-specific antigen ("PSA")[5] on the

perianal or anal swabs taken from the victim, T. 1278, 1288-89; however, PSA was found on

the shaft of the vibrator and vaginal and cervical swabs, though the levels were inconclusive

for seminal fluid, T. 1279, 1282.

### iii.    The Verdict and Sentence

The jury convicted petitioner of first-degree burglary, first-degree rape, first-degree

criminal sexual act, third-degree aggravated sexual abuse, first-degree sexual abuse, third-

---

[5] PSA is a "component of seminal fluid" but it is "not actually specific to [the] prostate [and can] . . . also be located in other bodily fluids, but at a significantly lower concentration."  T. 1279-1280.

degree assault, second-degree unlawful imprisonment, third-degree stalking, fourth-degree stalking, and third-degree menacing.  T. 1562-65; *accord People v. Horton*, 181 A.D.3d 986, 986 (3rd Dep't 2020) ("*Horton II*").

During petitioner's sentencing proceeding, pursuant to the consent of the parties, the unlawful imprisonment count was dismissed since it merged with the first-degree rape conviction.  S. 3.  Petitioner was ultimately sentenced to a determinate term of twelve years of incarceration and ten years of post-release supervision.  S. 19-22.

**B.    The Direct Appeal**

Petitioner filed a counseled appeal which argued that he was entitled to relief because (1) the trial court improperly instructed the jury on several occasions, SCR at 3, 25-33; (2) the counts in the indictment alleging forcible compulsion were rendered duplicitous by the trial testimony, SCR at 4, 33-34; (3) the trial court erred when it denied petitioner's motion to strike the amended bill of particulars, SCR at 4, 35-38; (4) the trial court erred in allowing items to be published to the jury which were not admitted into evidence, SCR at 4, 38-41; (5) the trial court abused its discretion when it denied petitioner's counsel's request for an adjournment to secure newly disclose evidence, SCR at 4, 41-45; (6) the prosecution violated the best evidence rule and elicited improper and prejudicial testimony, SCR at 4, 45-48; (7) the trial court made several erroneous evidentiary rulings, SCR at 4-5, 48-56; (8) there was prosecutorial misconduct throughout the trial, SCR at 5, 56-67; (9) petitioner's trial counsel was constitutionally ineffective, SCR at 5, 67-76; and (10) the verdict was against the weight of the evidence, SCR at 5-6, 76-80.  The People filed an opposition.  SCR at 528-585. Petitioner filed a pro se reply.  SCR at 691-706.

On March 5, 2020, the New York State Appellate Division, Third Department, affirmed the judgment.[6]  *Horton II*, 181 A.D.3d at 998.  With respect to the claims raised in the instant action, the Third Department first found that the trial court did not err in denying petitioner's motion to strike the People's amended bill of particulars.  *Id.* at 991-92.  Specifically,

> the People are free to file an amended bill of particulars at any time before . . . trial (*see* CPL 200.95[8]).  Nevertheless, [petitioner] argue[d] that the amendment here was impermissible because it constructively amended the indictment in violation of CPL 200.70(2), which provides that "[a]n indictment may not be amended in any respect which changes the theory or theories of the prosecution as reflected in the evidence before the grand jury which filed it."  However, "[i]t is well settled that the prosecution need not prove allegations in an indictment that are extraneous to the material elements of the offense charged" . . . Burglary in the first degree requires proof that a defendant "knowingly enter[ed] or remain[ed] unlawfully in a dwelling" (Penal Law § 140.30), but the statute does not provide that the method of entry is a material element of the offense, nor has defendant identified any case law precedent to that effect.  Thus, the amendment with respect to this issue did not alter the theory of the prosecution . . . Moreover, as it was [petitioner]'s testimony in the first trial that created the factual discrepancy between the proof and the initial bill of particulars, he cannot be heard to complain that either the indictment or the amended bill of particulars failed to "fulfill[ ] the statutory and constitutional requirements of due process and fair notice"

*Id.* at 305 (internal citations omitted).

The Third Department next found that the trial court properly excluded text messages which petitioner argued ought to be presented to the jury, because

> [t]he rule of completeness provides that a defendant is entitled to have the entirety of an admission, statement or recorded conversation . . . admitted into evidence . . . [h]owever, the rule does not mandate the admission of a text message simply because other text messages from the same phone, sent on different dates and dealing with different subjects, [be] admitted into evidence.

---

[6]  A copy of the Appellate Division's decision was included in the State Court Record.  SCR at 738-753.

*Id.* at 933.

The Third Department also denied petitioner's claim that he was entitled to an adjournment to call as a witness a veterinarian who was mentioned by the victim as the individual who provided her with the leash that was used to restrain her during the attack. *Horton II*, 181 A.D.3d at 993. The trial court discovered "that there was no veterinary practice in Dryden with the name provided by the victim and that, because the victim had expressed doubt about the identity of the veterinarian who had provided the rope, her credibility could not be impeached by the testimony of any particular veterinarian." *Id.* at 994. The Third Department stated that the trial court "should not have assumed the role of counsel by initiating its own investigation into the facts;" however, "even without the information gathered by the court, [petitioner's] contention is unavailing . . . [because petitioner] did not establish that the proposed collateral testimony would be material or relevant." *Id.*

Next, the Third Department held that petitioner's failure to make appropriate objections rendered his argument that the indictment counts charging forcible compulsion were duplicitous unpreserved for appeal. *Horton II*, 181 A.D.3d at 995. Further, the Third Department found petitioner's argument that his counsel's failure to object amounted to ineffective assistance meritless. *Id.* In sum, "there was no duplicity, as the Penal Law provides that the element of forcible compulsion may be proven by either physical force or by express or implied threats and does not establish separate offenses for these alternate forms of proof." *Id.* at 995-96 (citations omitted).

The Third Department also found that petitioner's claim that he was deprived of a fair trial due to prosecutorial misconduct was also unpreserved. *Horton II*, 181 A.D.3d at 996. Furthermore, the claim of prosecutorial misconduct was meritless. *Id.* at 996-97.

16

Petitioner's claims of ineffective assistance of counsel were also denied.  The Third Department denied petitioner's claims that his counsel was ineffective for failing to object to the admission of his former testimony because counsel's actions may have been motivated by strategic reasons.  *Horton II*, 181 A.D.3d at 997.

> [Petitioner's] prior testimony included damaging admissions that he entered the victim's home unlawfully, assaulted the victim and had sexual intercourse with her, [however, petitioner] had made similar admissions on the first two points to police and would have faced impeachment had he testified differently in the second trial. His counsel could have made the strategic decision that it would be less damaging to permit the admission of known, controlled prior testimony – read into evidence by a prosecutor rather than by [petitioner] himself – than to risk the unknown consequences of putting [petitioner] on the stand for a second time.

*Id.*  The Third Department also ruled that petitioner's claim that his counsel's summation was ineffective and prejudicial – because it conceded certain evidence which established petitioner's guilt to lesser crimes – was meritless and actually represented reasonable trial strategy.  *Id.* at 998.  Counsel instead "focus[ed] his arguments on the credibility issues related to the more serious charges."  *Id.*  Finally, the Third Department rejected all other ineffective counsel claims as meritless.  *Id.*

Petitioner filed a counseled application for leave to appeal.  SCR at 754-765.  As is relevant here, petitioner sought to appeal the Third Department's decision about whether it erred (1) in failing to direct that *Brady* material, specifically that regarding the identity of the veterinarian who gave the victim the leash which was later used in her attack, SCR at 755-57; (2) in its determination that it was not improper for the People to amend their bill of particulars and to change their theory prior to the commencement of the second trial, SCR at 758-760; (3) when it improperly instructed the jury on both definitions of forcible compulsion, SCR at 760-62; and (4) by precluding petitioner from admitting text messages pursuant to the

completeness doctrine, SCR at 762-63.  The People did not file an opposition.  On July 8, 2020, the New York State Court of Appeals denied leave to appeal.  *People v. Horton*, 35 N.Y.3d 1045 (2020).[7]

### C.    Collateral Challenges

#### 1.    Motion to Vacate the Judgment of Conviction

On September 3, 2020, petitioner filed a motion to vacate his conviction, pursuant to New York Criminal Procedure Law § 440.10 ("440 motion"), in Tompkins County Court.  SCR at 767-1150.  As is relevant to this action, the petitioner argued that he was entitled to relief because (1) the prosecutor committed misconduct in "fail[ing] to correct perjurious statements by several witnesses," and correct false testimony; (2) the prosecutor committed a *Brady* violation in failing to provide the name of the veterinarian who provided the victim with the leash allegedly used in the attack; (3) trial counsel was constitutionally ineffective for failing to (a) call an expert witnesses; (b) properly prepare motions to seek medical records; (c) ask for limiting instructions on the use of the text messages which petitioner sent; (d) competently cross examine various witnesses; (e) redact petitioner's trial testimony (instead of delegating the task to the prosecutor); (f) give an effective and persuasive summation; and (g) conduct adequate investigations and discover exculpatory evidence.  SCR at 767-848.

In support of his 440 motion, petitioner submitted a letter, authored on March 30, 2020, from Forensic Pathologist, Dr. James Terzian.  SCR at 1082.  Dr. Terzian stated that he had viewed the photographs taken of the victim by law enforcement and, in his opinion, they "do not support the accusation of restraint by a rope, or by any other similar such device," and the

---

[7]  A copy of the Court of Appeals' decision was included in the State Court Record.  SCR at 766.

"skin wounds to the [victim's] head . . . [we]re more likely to have been made by slapping than by slugging with a closed fist." *Id.*

Petitioner also supported his motion with a letter, dated July 1, 2020, from Dr. William Klepack. SCR at 876-79. In response to several written questions posed by the petitioner, Dr. Klepack explained common medical practice with prescribing drugs to patients and the symptoms, tests, and treatments for concussions. *Id.* These symptoms "include headache, dizziness, lack of awareness of surroundings, and nausea and vomiting;" as well as "mood and disturbances of thinking, sensitivity to light and noise, and sleep disturbances," which can appear immediately or evolve gradually over several minutes to hours to days. SCR at 876.

The People opposed the 440 motion. SCR at 1151-1160. In responding to the submission of Dr. Klepack's opinion, the People argued that the letter (1) is not "a sworn allegation of fact as is required by [New York law]," SCR at 1158 (internal quotation marks omitted); (2) "does not purport to render a thorough expert opinion and merely attempts to answer isolated questions posed to him by [petitioner,]" *id.*; (3) fails to specifically identify the photographs which Dr. Klepack examined, *id.*; and (4) "does nothing to undermine the evidence of [petitioner's] guilt in this case," *id.*

In sum, with respect to who caused the victim's injuries, the People argued that the letter "does little more than attempt to impeach the victim's testimony on a minor detail," and that the petitioner, "by his own testimony at the first trial, admitted to causing the injuries to the victim." SCR at 1158. The People drew similar conclusions about the utility of Dr. Terzian's opinion regarding the use of a rope to restrain the victim. SCR at 1159. The People argued that "[a]t best, Dr. Terzian's opinion . . . only means that he is unable to conclude from a single piece of evidence – photographs – that the injuries depicted are

consistent with restraint by a rope.  Thus, [the] . . . testimony would have been limited solely to the most limited of impeachment of the victim," which petitioner failed to prove would have been more successful than the other attempts at impeachment he proffered during his trial. SCR at 1159-1160.

On January 8, 2021, the Tompkins County Court denied the motion.  SCR at 1211-15. More specifically, the court first held that petitioner's claims of prosecutorial misconduct – specifically offering knowingly perjured testimony – was part of the trial record and, thus, was a matter for direct appeal.  SCR at 1212-13.  Furthermore, petitioner "point[ed] out minor or perceived inconsistencies in several witnesses' testimony . . . [h]owever, none of his examples demonstrate[d] that witnesses perjured themselves, let alone that the People and/or the Court knew their testimony to be false."  SCR at 1213.

Then, the court denied petitioner's contention that the failure to provide the victim's veterinarian constituted a *Brady* violation because (1) it was an issue that should have been raised on direct appeal, and (2) the Third Department "found that [petitioner] failed to demonstrate how the veterinarian's testimony would have been relevant or favorable to him." SCR at 1213.

The court also denied petitioner's claims of ineffective assistance of counsel.  SCR at 1213-15.  The court noted that "[m]ost of these issues (e.g. ineffective cross-examination, failure to object to admissible hearsay, failure to seek a limiting instruction, failure to move to obtain victim's mental health records) appear in the record and could be raised on direct appeal," where many of them were, and were rejected by the Third Department.  SCR at 1213.  Further, the court noted that petitioner's "allegations . . . are unsupported by any evidence that would be favorable or relevant at trial."  SCR at 1214.  The interrogatories that

petitioner sent to various medical professionals either provided general or incomplete answers, and none of the statements were sworn. *Id.* Further, petitioner "failed to demonstrate how the . . . unsworn statements . . . were exculpatory." *Id.* The court concluded that "[g]iven the overwhelming evidence of the victim's injuries at trial, counsel's failures to call these [doctors as] witnesses does not constitute ineffective assistance." *Id.* Further, petitioner's allegations that "counsel failed to investigate by not hiring medical witnesses . . . is all conclusory." SCR at 1215. Finally, the court "conducted an *in camera* review of [the victim's Family Court records and her] . . . sworn statements in the pleadings are consistent with her testimony at the criminal trial." *Id.* Thus, petitioner failed to show how those "records would be exculpatory or relevant." *Id.*

Petitioner sought leave to appeal the denial of the 440 motion with the Appellate Division. SCR at 1216-1233. On March 5, 2021, the Third Department denied petitioner's application. SCR at 1234. Petitioner then moved for reargument, SCR at 1235-1257, which the Third Department denied on May 7, 2021, SCR at 1284. Petitioner then sought leave to appeal the denial of the 440 motion with the Court of Appeals. SCR at 1285-1303. However, the application was dismissed on May 11, 2021, because the Third Department's order was not appealable under New York Law. SCR at 1304.

### 2.    Coram Nobis Petition

Petitioner filed a pro se petition for coram nobis relief with the Third Department arguing that he was denied effective assistance of appellate counsel because appellate counsel (1) failed to raise the claim that the prosecution had violated its obligations pursuant to *Brady*; (2) did not argue that petitioner's rights under the confrontation clause were violated when Dr. Crepet testified that she prescribed the victim medication based on her consultation

with another doctor, who also did not testify; and (3) failed to challenge the fairness of the grand jury proceedings. SCR at 1305-1333. On June 11, 2021, the Third Department denied the motion. SCR at 1412.

Petitioner then sought leave to appeal the denial. SCR at 1413-1437. The Court of Appeals denied the application on November 29, 2021. SCR at 1438. Petitioner moved to reargue the denial of his leave application, SCR at 1439-1452, which the Court of Appeals also denied on February 16, 2022, SCR at 1453.

### 3.     Motion to Set Aside Sentence

Petitioner then filed a pro se motion to set aside his sentence, pursuant to New York Criminal Procedure Law § 440.20, arguing that he was entitled to relief because he was illegally given consecutive sentences for his burglary and rape convictions. SCR at 1454-1461. The People filed an affirmation in opposition to the motion, SCR at 1462-67, and petitioner filed a reply, SCR at 1469-1472.

On November 30, 2021, the county court denied petitioner's motion. SCR at 1473-74. Specifically, the judge concluded that "[t]he elements of the crimes do not overlap and the facts demonstrate that the [petitioner's] acts underlying each crime were separate and distinct . . . and consecutive sentences are therefore possible." SCR at 1474.

Petitioner sought leave to appeal the denial of his motion. SCR at 1475-1484. The motion was denied by the Third Department on January 14, 2022. SCR at 1485. Petitioner sought reargument and reconsideration of the Third Department's denial. SCR at 1486-1505. On March 8, 2022, the motion was denied. SCR at 1506.

## III.     PRESENT PETITION

22

Petitioner contends that he is entitled to federal habeas corpus relief because (1) he suffered several *Brady* violations when the People failed to disclose exculpatory evidence, Pet. at 1, Dkt. No. 2 at 4-7, Dkt. No. 3 at 12-17; (2) petitioner's rights under the Confrontation Clause were violated when the People had one witness testify to the actions and opinion of another person, Pet. at 7, Dkt. No. 2 at 7-8, Dkt. No. 3 at 17-19; (3) the trial court erred in allowing the People to amend the Bill of Particulars as it violated petitioner's Due Process rights, Dkt. No. 2 at 8-9, Dkt. No. 3 at 19-23; (4) the trial court erred when it allowed a different theory of forcible compulsion to be considered by the jury, Dkt. No. 2 at 9-10, Dkt. No. 3 at 23-25; (5) the state court decision denying petitioner's *Brady* claims was contrary to federal law and the doctrine of completeness, Dkt. No. 2 at 11, Dkt. No. 3 at 25-27; (6) petitioner's counsel was constitutionally ineffective, Dkt. No. 2 at 11-19, Dkt. No. 3 at 27-35; (7) petitioner suffered prosecutorial misconduct when the People presented fraudulent testimony and failed to turn over all *Brady* material, Dkt. No. 2 at 19-21, Dkt. No. 3 at 35-36; and (8) petitioner's sentence is illegal and constitutes cruel and unusual punishment, Dkt. No. 2 at 21, Dkt. No. 3 at 36.

Respondent filed an opposition arguing that petitioner's claims should be denied for various reasons including a failure to exhaust the claims, procedural default, claims wholly lacking in merit, and attempting to assert non-cognizable claims. Dkt. No. 20-1 at 26-58. Petitioner filed a reply. Dkt. No. 26.

In his reply, petitioner withdrew two portions of his ineffective assistance of counsel claim and his excessive sentencing claim. Dkt. No. 26 at 34, 39, 40. Specifically, petitioner indicated that his claims that counsel's failure to personally redact his trial testimony – instead delegating the task to the prosecutor – and his contention that his counsel failed to deliver an

effective summation, should both be withdrawn from consideration as the claims are weak,

petitioner requests no further review of them by the Court, and petitioner instead rests the

success of his claim on the six other instances of ineffective counsel that he outlined.  *Id.* at

34, 39.  Furthermore, petitioner "[a]grees [that the] challenge to [the] imposition of

consecutive sentences is [a] state claim and not cognizable for federal habeas review and

withdraws th[e] issue from consideration by this Court."  *Id.* at 9; *see also id.* at 40 ("Petitioner

agrees with [the respondent] on this issue after further consideration and as such wishes to

withdraw this whole point for review by this Court and seeks no federal claim in the future on

this issue.").  Accordingly, consistent with petitioner's express wishes, the undersigned will

only evaluate the seven remaining claims.

## IV.    DISCUSSION

### A.    Claim One: *Brady* Violations[8]

This Court has previously explained that a petitioner's due process rights can be

violated by a prosecutor's failure to produce evidence.

> Prosecutors must disclose to an accused exculpatory
> information in their possession that is favorable to the defense
> and material to guilt or punishment, *Brady [v. Maryland]*, 373
> U.S. [83,] 87 [(1963), and evidence affecting the credibility of a
> witness, where the reliability of the witness could determine guilt
> or innocence, *Giglio v. United States*, 405 U.S. 150, 154 (1972).

*Major v. Lamanna*, No. 9:18-CV-0418 (DNH/TWD), 2021 WL 4267851, at *18 (N.D.N.Y. Sept.

3, 2021), *adopting Report and Recommendation*, 2022 WL 408819 (N.D.N.Y. Feb. 10, 2022).

 However, not every failure to disclose information constitutes a constitutional violation.  *See*

*Strickler v. Greene*, 527 U.S. 263, 281 (1999).

---

[8]  Respondent argues that some of petitioner's *Brady* claims are unexhausted and/or procedurally barred.  Dkt. No. 20-1 at 27-30.  Because the undersigned has determined that they are clearly meritless, the procedural arguments will not be further discussed.

"To establish a *Brady* violation, a [petitioner] must show (1) that the evidence at issue is favorable to [him], either because it is exculpatory, or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued." *United States v. Paulino*, 445 F.3d 211, 224 (2d Cir. 2006) (citing *Strickler*, 527 U.S. at 281-82) (internal quotation marks omitted). *Brady* is not violated "unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at 281.

A petitioner bears the burden of proving that the prosecution withheld material information. *Harris v. United States*, 9 F. Supp. 2d 246, 275 (S.D.N.Y. 1998). "Conclusory allegations that the government 'suppressed' or 'concealed' evidence do not entitle [the petitioner] to relief." *Id.* (quotations omitted); *see also Mallet v. Miller*, 432 F. Supp. 2d 366, 378 (S.D.N.Y. 2006) (*Brady* claim dismissed where supported only by conjecture); *Flynn v. Colvin*, No. 9:13-CV-1247 (JKS), 2016 WL 7053582, at *6 (N.D.N.Y. Dec. 5, 2016) ("It is well-settled in this Circuit that vague and conclusory allegations that are unsupported by specific factual averments are insufficient to state a viable claim for habeas relief.") (citation omitted).

### i.    Bedroom Photographs

Petitioner first argues that there were photographs taken of the victim's bedroom, by Officer Tagliavento, that were never turned over despite specific requests for police photos. Dkt. No. 2 at 4.  Respondent argues that the photographs of the victim's room were disclosed to the defense and introduced at trial, as People's Exhibits 30 through 36.  T. 732-34. Consequently, these photographs cannot support a *Brady* claim because it was disclosed to the defense and utilized as a trial exhibit, published for the jury and all parties to examine. *Boyd v. Sticht*, No. 6:18-CV-6614, 2022 WL 2704526, at *14 (W.D.N.Y. July 12, 2022)

(holding that evidence is not suppressed where it is "disclosed . . . to the defense and offered to [be] ma[d]e available for inspection.") (citations omitted).

Petitioner then argues that there is a direct reference to these photos in the police report authored by Tagliavento.  SCR at 857-860.  What the police report says is that Tagliavento "secured several photo's while on scene of [the victim's] bedroom, the gate where entry to the yard was made, and also the dog door where [petitioner] forcefully squeezed himself through to gain access into the inside of the house."  SCR at 860. Petitioner argues that this means that there are two sets of photographs, taken at different times.  Dkt. No. 26 at 17.  Petitioner contends that the photographs which Tagliavento "secured" are apparently different from those that were admitted into evidence which "have a propensity to be staged."  *Id.*  In sum, petitioner contends that disclosure of the photographs which were secured by Tagliavento would "show the actual condition of the bedroom along with the sheets and clothing and what exactly everything looked like."  *Id.*

This argument is contrary to the testimony that was presented at the trial.  Petitioner's counsel cross-examined Tagliavento about the photographs, and the Officer testified that he recognized the photos of the victim's bedroom; however, he was not the person who took them.  T. 957-59.  Instead, he thought the other officer assigned to the scene did.  T. 959. Tagliavento specified that he was tasked with taking photographs of the exterior of the house and the point of entry.  T. 958.

This testimony is not inconsistent with the police report: Tagliavento took photos of a certain area of the crime scene and was with, and observed, other areas of the crime scene which other officers photographed.  Just because Tagliavento was in possession of all the photos taken at the end of the day does not mean his explanation about what his

responsibilities were in gathering information to investigate the case was untrue or

incomplete.  Further, nothing about the statement in the police report supports petitioner's

assertion that a second set of photographs was taken.  Petitioner's conclusory and fanciful

assertions are belied by the record.  *See Chrysler v. Guiney*, 14 F. Supp. 3d 418, 450

(S.D.N.Y. 2014) ("Conclusory or speculative allegations that the Government failed to

disclose evidence are insufficient to support a *Brady* violation.").

    Moreover, even if there was a second set of pictures taken, petitioner has failed to

sufficiently explain how those photos would have assisted in his defense or outweighed his

own admissions to striking the victim and her testimony that she had been physically and

sexually assaulted by the petitioner.  *See United States v. Agajanian*, 852 F.2d. 56, 58-59 (2d

Cir. 1988) (denying claims of *Brady* violation where the petitioner made no "showing of how

[the allegedly suppressed evidence] would have assisted in his defense or that there is a

reasonable possibility that, had the evidence been disclosed . . . the result of the proceeding

would have been different.").

### ii.    Dr. Crepet's Notes

    Petitioner also argues that the People withheld Dr. Crepet's shorthand notes, despite

specifically requesting them due to the information therein about the medication that was

provided to the victim and the details of her concussion diagnosis.  Dkt. No. 2 at 4.  Petitioner

contends that Dr. Crepet's grand jury testimony indicated that she took choppy notes during

the victim's visit, and the Court cannot be satisfied by the production of Dr. Crepet's medical

reports alone, since those reports "cannot be deemed [a] duplicate equivalent and original

notes are needed."  Dkt. No. 3 at 13-14.  Specifically, the "[n]otes are crucial to show exactly

what treatment was given that day and not some [e]mbellished on report made out days to

weeks later." Dkt. No. 26 at 18. Petitioner concludes that the prejudice he faces, without access to the notes, is not being able to address an alleged inconsistency between Dr. Crepet's findings with the victim's statement, that "she feels fine," and the Cortland Hospital's findings that there was nothing wrong with the victim. Dkt. No. 3 at 13-14.

It is undisputed that records from Dr. Crepet's office, on the days she treated the victim, were identified and submitted as evidence during the trial. T. 821-23. Those, along with her testimony, provided a full picture for the continuing care that the victim sought, which was consistent with the victim's testimony. Petitioner has provided no indication that the handwritten notes which he seeks contain different or contrary information than what was in the medical records that were submitted as evidence. *See United States v. Rowland*, No. 3:14-CR-0079, 2015 WL 800083, at *4 n.6 (D. Conn. Feb. 25, 2015) (holding that assertions there is a discrepancy between a final report and hand-written notes, specifically the omission of some information rather than the representation of a complete account, "is not sufficient to show that a *Brady* violation has occurred."), *aff'd,* 826 F.3d 100 (2d Cir. 2016).

Instead, petitioner asks the undersigned "to assume by intentionally failing to turn over requested *Brady* it ha[d] to be favorable to [his criminal defense.]" Dkt. No. 3 at 14. However, petitioner wholly misunderstands his burden, and the Court cannot and will not make that assumption. *See Harris*, 9 Supp.2d at 275 ("the government does not bear the burden of establishing the documents were *not* withheld; it is [the petitioner's] burden to prove that the government failed to disclose evidence favorable to [him].").

Further, petitioner has failed to establish prejudice because he has failed to demonstrate a reasonable probability that, even if these notes existed, it would be enough to have changed the jury's verdict. The presence or absence of a concussion and the pain

medication used to treat its symptoms are, at best, a tangential issue to whether the petitioner was guilty of the crimes he was accused of committing.  There was plenty of other evidence which pointed to petitioner's guilt – his prior admission that he had entered the victim's home, without permission, and physically struck the victim in the head and neck, along with the testimony and photographs of the victim and the testimony from the sexual assault nurse examiner – so that the admission of these notes, and any possible impeachment that arguably could have happened, was not so great as to have turned the tide.  *See Patel v. Smith*, No. 1:21-CV-0992, 2022 WL 1460211, at *5 (E.D.N.Y. May 9, 2022) (explaining that *Brady* material with minimal impeachment value is insufficient to demonstrate prejudice, especially where there is other significant evidence of guilt).

### iii.    Chief Barber's Notes & Records of Lawsuits Against Him

Petitioner also argues that *Brady* violations occurred because the prosecution failed to turn over notes from the Ithaca Police Chief Barber, the victim's relation by marriage, as well as information about lawsuits filed against Chief Barber in his official capacity.  Dkt. No. 3 at 14-15.  Petitioner disagrees with the respondent's characterization of Chief Barber's involvement in the case, stating that "Barber did not just innocently listen to [the victim] and then escort her to the police station[.]"  Dkt. No. 26 at 18.  Instead, petitioner contends that Barber "instruct[ed] officers what evidence [wa]s and where it c[ould] be located and collected in the bedroom and also instruct[ed the victim] to put forth allegation[s] of being restrained by a rope," so that petitioner would face a harsher and more significant penalty.  *Id.*

Petitioner's assertions again suffer from many of the same deficiencies already noted.  First, there is no indication anywhere in the record that Chief Barber prepared any notes or other written materials after the victim discussed the attack with him.  The lack of notes is

reasonable since Chief Barber was not involved in the criminal investigation; petitioner initially turned himself into the New York State Police and then the Dryden Police Department took over the investigation.  Petitioner's speculative and conclusory contrary assertions alone are insufficient.  *See Harris*, 9 F. Supp. 2d at 275.  Second, even if this set of notes did exist, petitioner has failed to explain, let alone demonstrate, how they would be favorable to his defense.

Moreover, "evidence is favorable to the accused if . . . it impeaches a government witness."  *United States v. Gil*, 297 F.3d 93, 101 (2d Cir. 2002) (citing cases).  Accordingly, to the extent other lawsuits have been filed, the merits of which would challenge Chief Barber's character, they would only be useful to impeach his credibility as a witness.  However, Chief Barber never testified during petitioner's criminal trial; therefore, there was no opportunity to impeach him.  This renders the lawsuits irrelevant to petitioner's state criminal proceedings.  Consequently, petitioner suffered no prejudice as the result of their nondisclosure.

### iv.    Identity of Veterinarian

Petitioner again reiterates the argument that the prosecution's failure to turn over the name/identity of the veterinarian who provided the victim with the leash that was then used to retrain her constituted a *Brady* violation.  Dkt. No. 3 at 15-16.  Petitioner contends that this information was specifically requested, and ignored, and, had it been provided, petitioner could have proven that the victim "never even ever went to a vet . . . [which] would put another mark on her credibility as to [the] truth[.]"  Dkt. No. 26 at 19.

Petitioner's argument first fails by his inability to show that the prosecution had access to this information.  When the victim was cross-examined on this point, she shared that she thought she went to "the Dryden Veterinary Hospital on Route 13;" however, she could not

recall any further specifics because there were "multiple veterinarians there."  T. 810.  Her uncertainty with the details was further corroborated by the Appellate Division's findings during petitioner's direct appeal, when the Third Department discussed the trial court's findings that there was no veterinary practice in Dryden with the name provided by the victim. Petitioner fails to prove that, despite the victim's confusion and the inability of the state courts to identify the practice to which the victim was referring, the prosecution knew the details all along.

Moreover, petitioner has failed to demonstrate that uncovering the identity of the veterinarian would lead to any exculpatory material or a different outcome for his trial.  The origination point of the leash had nothing to do with the ultimate question of whether petitioner committed the criminal acts of burglary and assault.  In sum, knowing the source of the leash would not have reasonably changed the jury's verdict.

### v.    Victim's Cell Phone

Finally, petitioner argues that the failure to turn over the victim's cell phone, so that it could be determined whether she had contact with the police department when they were at her house searching for evidence and her friend Valerie Beckley, constituted a *Brady* violation.  Dkt. No. 3 at 16-17.  Specifically, that information would assist petitioner in impeaching the victim's credibility because "[a]ny evidence to show that [the victim] . . . was less than truthful on [a] material fact is thereby prejudicial in nature and completes the third prong of *Brady*."  Dkt. No. 26 at 20.

However, petitioner again misunderstands the relevant standard.  The litmus test is not just that information may have an ability to assist impeaching the victim.  Accordingly, any evidence tending to show that a victim "was less than truthful" does not equate to a *Brady*

violation.  The purported evidence must be of the sort that there is a reasonable probability it would have resulted in a different verdict.  Petitioner fails to explain how having the victim's phone and proving either of these two tangential facts would have "put the whole case in such a different light as to undermine confidence in the verdict."  *United States v. Mahaffy*, 693 F.3d 113, 127 (2d Cir. 2012).

## B.    Claim Two: Denial of Petitioner's Right to Confrontation[9]

Petitioner argues that his rights to confront a witness were violated when he was denied the ability to speak with a physician who Dr. Crepet allegedly consulted with and who recommended prescribing certain medications to treat the victim's symptoms after she was attacked.  Dkt. No. 26 at 21.  Petitioner contends that speaking with this consulting medical professional is important because the victim was seen by several healthcare providers, all with the capability of prescribing medication, and petitioner contends that none did.  *Id.*  Accordingly "deceptive information was [presented to the] jury to consider the extent [of the victim's] pain level and injury[,]" which presumably could have been clarified had petitioner had the opportunity to cross-examine this third party medical professional.  *Id.*

The Confrontation Clause, contained in the Sixth Amendment, provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.

> Out-of-court statements sought to be introduced into evidence at trial are subject to Confrontation Clause requirements if they are "testimonial."  *Michigan v. Bryant*, 562 U.S. 344, 356-58. . . (2011).  Statements are "testimonial" if the "primary purpose of the interrogation" that elicited the statements was to create "an out-of-court substitute for trial testimony."  *Id.*  The primary purpose of an interrogation that is subject to such scrutiny is determined through

---

[9]  Respondent argues that petitioner's confrontation claim is subject to procedural default because it was not exhausted in state court.  Dkt. No. 20-1 at 34.  Because the undersigned has determined that they are clearly meritless, the procedural arguments will not be further discussed.

> an "objective analysis of the circumstances of an encounter and
> the statements and actions of the parties to it." *Id*. at 360[.]

*Pham v. Kirkpatrick*, 711 F. App'x 67, 68–69 (2d Cir. 2018).

The Supreme Court has expressly "decline[d] to adopt a rule that statements to individuals who are not law enforcement officers are categorically outside the Sixth Amendment;" however, "[c]ourts must evaluate challenged statements in context . . . [and s]tatements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial[.]" *Ohio v. Clark*, 576 U.S. 237, 249 (2015). To that end, there have been several instances in the Second Circuit where statements made to medical professionals for the primary purpose of providing medical treatment have been categorized as not testimonial statements which are outside of the purview of the Confrontation Clause. *See Pham,* 711 F. App'x at 69-70; *Duhs v. Capra*, 639 F. App'x 691, 694 (2d Cir. 2016); *Montanez v. Tynon*, No. 1:18-CV-1766, 2018 WL 6268221, at *6 (S.D.N.Y. Nov. 30, 2018) (concluding that because "the challenged information contained in the medical records was communicated by [the victim] to hospital personnel in the context of treating the injuries sustained in the fight with petitioner[, t]he primary purpose of those conversations was clearly to assist in medical diagnosis and treatment," and, therefore, the information "did not run afoul of the Confrontation Clause") *see also State v. Miller*, 264 P.3d 461, 479-81 (2011) (collecting various state court decisions where a patient's statements to a doctor were found to be nontestimonial).

The same logic holds true here. Even crediting all of petitioner's assertions, that Dr. Crepet engaged in a consultation with another medical professional about the best pharmaceutical treatment to address the victim's injuries, those conversations were not testimonial in nature. Instead, the primary purpose was to assist in the victim's recovery after

she sustained injuries during an assault.  Accordingly, petitioner's rights under the

Confrontation Clause have neither been triggered nor violated.

      **C.**      **Claim Three: Trial Court Improperly Allowed the People to Amend the Bill of Particulars**

      Petitioner next argues that his Due Process rights were violated when, prior to the

second trial, the prosecution amended the bill of particulars.  Pet. at 1; Dkt. No. 2 at 8-9. As

previously explained, prior to the first trial, the bill of particulars indicated that petitioner

entered the victim's home through a doggy door and then proceeded into her residence.

SCR at 435.  Pursuant to petitioner's testimony, he clarified that he entered the victim's home

through an unlocked back door.  T. 1116-19.  Consequently, prior to the second trial, the

prosecution filed an amended bill of particulars that omitted the specific mode of entry into the

victim's home, citing New York Criminal Procedure Law § 200.95(1)(a) to support the

proposition because they had no obligation to provide that information.  SCR at 421.

Petitioner unsuccessfully challenged the amended bill of particulars before the trial court and

during his direct appeal.

      Respondent argues that petitioner's claim is not cognizable on habeas review because

it alleges a violation of state law.  Dkt. No. 20-1 at 36-37.  Petitioner contends that this issue

"is reviewable as the Appellate Court in its decision does not state the state law of due

process or of bill of particulars both of which are also federal issues."  Dkt.  No. 26 at 22.

Petitioner then goes on to state that the appellate court was factually incorrect on three

points: (1) there is no precedent case law that "Method of Entry" is a material element of a

burglary charge; (2) there is no precedent case law that manner of entry can be utilized to

determine criminal intent; and (3) petitioner's prior testimony did not negate the prosecution's

obligation to prove the theories which they advanced to the grand jury, which was that

petitioner entered the victim's home through her doggy door. *Id.* at 23.

Habeas corpus relief is available if a prisoner is "in custody in violation of the

Constitution or laws or treaties of the United States[.]" 28 U.S.C. § 2254(a). Accordingly, "[a]

federal court may not issue the writ on the basis of a perceived error of state law." *Pulley v.*

*Harris*, 465 U.S. 37, 41 (1984). Therefore, to the extent that petitioner seeks federal habeas

relief because respondent failed to comply with New York State law, such relief is

unavailable.

Despite petitioner's allegations to the contrary, "a mere statement that 'due process'

rights have been violated does not necessarily give rise to a specific federal constitutional

claim. 'Due process' . . . can be a catchphrase used by habeas petitioners as part of an

allegation about any type of trial error, including errors . . . based on state law." *Petrucelli v.*

*Coombe,* 735 F.2d 684, 688 (2d Cir. 1984). Here, petitioner's arguments concerning the

amended bill of particulars challenge state court laws. Particularly, New York Criminal

Procedure Law § 200.95(1)(a) defines a bill of particulars as "a written statement by the

prosecutor specifying . . . items of factual information which are not recited in the indictment

and which pertain to the offense charged . . . which the people intend to prove at trial on their

direct case," and § 200.95(8) allows for its amendment "[a]t any time before commencement

of trial[.]" Petitioner's complaints that the amendment should not have been allowed and that

the substance of the amended bill of particulars was incorrect both challenge provisions of

the New York Criminal Procedure Law. *See Beverly v. Walker*, 899 F. Supp. 900, 908

(N.D.N.Y. 1995) (denying claims about a request for a bill of particulars, pursuant to N.Y.

Crim. Pro. Law §§ 200.95(2) & (4), because petitioner alleged state law violations).

Accordingly, petitioner's claim is not cognizable.

> **D.    Claim Four: Due Process Violation Occurred Because the Proof of Forcible Compulsion on the Sexual Assault Counts Deviated from the Bill of Particulars**

Petitioner next argued that his due process rights were violated because the prosecution's proof on the forcible compulsion element of the sexual assault charges deviated from the theory of forcible compulsion outlined in the bill of particulars.  Pet. at 10.

The indictment charged petitioner with various burglary, assault, stalking, and menacing offenses, as well as first degree rape, first degree criminal sexual act, first degree sexual abuse, and two counts of third degree aggravated sexual abuse.  SCR at 524-27.  All of the sex crimes accused petitioner of engaging in sexual intercourse or sexual conduct with the victim "by forcible compulsion."  SCR at 525-26.  The amended bill of particulars explained that, for the first degree rape charge, "[a]fter beating the victim over her head, face and body, the [petitioner] then tied the victim's hands behind her back and without any right, permission or authority and against the victim's will put his penis in the victim's vagina."  SCR at 423.  No other description of forcible compulsion was included about the other counts alleging sexual crimes.  SCR at 424-27.

During the charge conference, after the close of trial evidence, petitioner's trial counsel argued that the issue of forcible compulsion needed to be limited to petitioner's use of the leash.  T. 1346.  The prosecution objected, contending that the leash was one of many forms of compulsion, including being slapping, hit, bit, threatened, and physically manhandled.  T. at 1346-47.  The trial court denied petitioner's request.  T. 1347.  Petitioner unsuccessfully raised the claim on direct appeal.

Respondent argues that the claim is not cognizable on habeas review.  The undersigned agrees as the Second Circuit has held "that the prosecutor's arguments . . . exceed[ing] the theory disclosed in the Bill of Particulars . . . presented another issue wholly under state law, not cognizable on federal habeas review."  *Garson v. Perlman*, 541 F. Supp. 2d 515, 522 (E.D.N.Y. 2008) (citing *Diguglielmo v. Smith*, 366 F.3d 130, 136 (2d Cir. 2004).

Petitioner clarifies that because it is unclear whether the jury convicted petitioner based on his purported legal ground, forcible compulsion by overwhelming physical force and the leash, or by the allegedly illegal alternative, forcible compulsion by threats, the guilty verdict must be set aside.  Dkt. No. 26 at 24.  However, petitioner misunderstands the forcible compulsion element.  Pursuant to New York law, forcible compulsion is proven "by either (a) use of physical force; or (b) a threat, express or implied, which places a person in fear of immediate death or physical injury to . . . herself[.]"  N.Y. Penal Law § 130.00(8).  This means that forcible compulsion can be proven by the presence of either physical force or threats.  Both need not be present and either can satisfy the necessary criteria for the criminal element.  Consequently, petitioner's argument that the physical force aspect of the definition is legal, and the threats are not, is meritless and unpersuasive.

Here, the bill of particulars was consistent with the penal law's definition, as was the proof that was provided during the prosecution's case against the petitioner, namely that petitioner used his size to position himself over the victim, slap and punch her upper body, restrain her arms behind her back, forcefully reposition her body several times, and threaten the health of the victim and her dog if the victim tried to fight back or escape.  Accordingly, petitioner's claim must be denied.

**E.      Claim Five: The Doctrine of Completeness was Violated When Proper Exculpatory Evidence Was Excluded from the Trial[10]**

Petitioner argues that the trial court erred when it refused to admit additional text messages that petitioner sent from his cell phone which, petitioner argues, would have provided full context regarding his state of mind during the time in question.  Dkt. No. 3 at 25-27.  Specifically, during Investigator Kane's testimony, the People admitted a text message that was sent from petitioner's phone to his sister, on March 26th, that said "Do not tell a single person me and [the victim] made love last night.  I could be charged with rape.  Thanks."  T. 1031.

To rebut this statement, petitioner's trial counsel sought to enter three texts into evidence.  The first was a text message, sent to his sister, nine hours after the first, which said "Let people talk, I will have my day in court."  T. 1037, 1041-43, 1254.  The second, sent during the time of the crime, was sent to a third party indicating that he was with the victim, at her home.  T. 1255.  The final text was sent on March 16th, a week and a half prior to the assault, stating that "Tuesday when the kids are gone . . . we can whoop it up anally."  T. 1256.  Petitioner's counsel argued that, if not under the doctrine of completeness, then the hearsay state of mind exception should apply to all three examples.  T. 1254-56.

The trial court denied the motion.  First, the court explained that these texts were not part of a single, discreet piece of evidence – like an interrogation transcript – and so the completeness doctrine was inapplicable.  T. 1264.  Second, the court also rejected petitioner's arguments that the state of mind exception was applicable to any of the offered text messages.  T. 1264-65.

---

[10]  Respondent argues that petitioner's Doctrine of Completeness claim unexhausted because petitioner challenged the claim, on direct appeal, in only state law terms.  Dkt. No. 20-1 at 40.  Because the undersigned has determined that they are clearly meritless, the procedural arguments will not be further discussed.

Generally, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see also Roberts v. Scully*, 875 F. Supp. 182, 189 (S.D.N.Y. 1995) ("In general, rulings by the state trial court on evidentiary questions are a matter of state law and pose no constitutional issue.") (citing *Estelle* and other Supreme Court cases holding the same).  "However, when a trial court's evidentiary exclusions take on constitutional dimensions . . . we must examine the stated reasons for the exclusion and inquire into possible state evidentiary law errors that may have deprived the petitioner of a fair trial." *Scrimo v. Lee*, 935 F.3d 103, 114 (2d Cir. 2019) (internal quotation marks and citations omitted).

The Supreme Court has held that a criminal defendant has a Sixth Amendment right to a meaningful opportunity to present a complete defense.  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986).  This right "is not, however, unlimited; rather it is subject to reasonable restrictions [provided by] . . . state and federal rules of procedure and evidence designed to assure both fairness and reliability[.]"  *Wade v. Mantello*, 333 F.3d 51, 58 (2d Cir. 2003).

> In considering whether the exclusion of evidence violated [the] . . . right to present a complete defense, the reviewing court should start with "the propriety of the trial court's evidentiary ruling." *Wade*, 333 F.3d at 59; *see also Washington v. Schriver*, 255 F.3d at 57.  The inquiry "into possible state evidentiary law errors at the trial level" assists the reviewing court in "ascertain[ing] whether the appellate division acted within the limits of what is objectively reasonable."  *Hawkins*, 460 F.3d at 244 (quoting *Jones v. Stinson*, 229 F.3d 112, 120 (2d Cir. 2000)).
>
> If potentially exculpatory evidence was erroneously excluded, the reviewing court then looks at "whether 'the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'"  *Justice v. Hoke*, 90 F.3d 43, 47 (2d Cir. 1996) (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976)) (alteration in original); *accord Hawkins*, 460 F.3d at 244 (citing *Wade*, 333 F.3d at 59 (stating that "[t]his test applies post-AEDPA")).  If, on the other hand, the state court's

> evidentiary ruling was correct as a matter of state evidentiary law, the habeas court's "inquiry is more limited[,]" addressing itself only to "whether the evidentiary rule is 'arbitrary' or 'disproportionate to the purposes [it is] designed to serve.'" *United States v. Scheffer*, 523 U.S. at 308 (quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)); *see also Holmes v. South Carolina*, 547 U.S. 319, 323-25 (2006). A state evidentiary rule is "unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused." *Scheffer*, 523 U.S. at 308.

*Gaylord v. Corey*, No. 9:22-CV-588 (GTS/ATB), 2023 WL 8812844, at *6 (N.D.N.Y. Oct. 24, 2023), *report and recommendation adopted,* 2023 WL 8806146 (N.D.N.Y. Dec. 19, 2023).

As respondent properly argues, petitioner's statements were not admissible under the doctrine of completeness. Accordingly, the state courts did not err in excluding them from the admitted testimony.

As the Second Circuit has explained:

> New York's rule of completeness compels admission of both inculpatory and exculpatory elements of a single statement when a party seeks to introduce one of those portions without the other. *See People v. Dlugash*, 41 N.Y.2d 725, 736. . . (1977); *see also People v. Torre*, 42 N.Y.2d 1036, 1037. . . (1977). The rule is grounded in equity "to avoid misleading the trier of fact about the statement's tenor." Richard T. Farrell, *Prince, Richardson on Evidence* § 1–102 (11th ed. 1995). Thus, if part of a statement is admitted, the rule of completeness requires that another part, "explanatory of the admitted portion," also be put into evidence. *People v. Walker*, 285 A.D.2d 364, 365 . . . (1st Dep't 2001). It is critical to the rule, however, that the statements be part of "a single continuous narrative." *People v. Hubrecht*, 2 A.D.3d 289, 290 . . . (1st Dep't 2003). The rule is not violated by the exclusion of a later statement explaining an earlier one "made to different persons in different settings." *Id.*

*Bowman v. Racette*, 661 F. App'x 56, 58 (2d Cir. 2016).

Here, petitioner's first text, about having his day in court, was sent to his sister nine hours after the first statement, asking her not to tell people that petitioner and the victim had slept together because he could be charged with rape. While it might be arguable that the

two texts deal with related subject matter, since a rape charge would presumably be prosecuted, the omission of the second message would not mislead the jury on the content of the first.  The combination of the considerable gap between conversations, and the fact that the second text concerned subject matter that was not required to further explain the meaning of the first message leads to the conclusion that these messages were not part of the same narrative.

Petitioner's second and third text messages are even more difficult to place within the doctrine of completeness category.  Those messages were sent to different people (not his sister), on different dates, and concerned completely unrelated topics (petitioner's whereabouts on the evening of the attack, which placed him at the victim's home, and petitioner's preference on other potential sexual activities occurring at times other than the attack in question).  Again, neither of these text messages were necessary to amplify, clarify, or otherwise further explain the meaning of the message petitioner originally sent to his sister. Accordingly, the state courts did not err in excluding these other two statements.[11]

Even assuming that the state court evidentiary rules were improperly applied, there is no indication that these messages, had they been provided to the jury, would have created reasonable doubt in the jury's mind.  The text messages in question do not negate petitioner's prior admissions that he had entered the victim's home, without her permission, and that he had physically struck her.  They also do not contradict the victim's testimony

---

[11]   Liberally construing petitioner's submissions, it also appears that he is contending that these text messages should have been admitted through the state of mind hearsay exception.  Regardless of whether the text messages should have been admitted to show petitioner's state of mind, the same ultimate conclusion holds true.  There is no indication that the provision of any of these messages would have changed the outcome of this case by casting reasonable doubt into any of the jurors' minds.

about what happened on the night she was attacked.  Accordingly, the exclusion of these text messages did not violate petitioner's constitutional rights.

### F.    Claim Six: Ineffective Assistance of Trial Counsel[12]

Petitioner claims that his trial counsel was constitutionally ineffective for several reasons.  Dkt. No. 2 at 11-14.  Specifically, petitioner argues that his counsel failed to (1) conduct an adequate investigation by contacting medical experts, Chief Barber, or Dryden Police Chief Watkins; (2) file proper motions; (3)  seek limiting instructions following the admission of the text message he sent to his sister; (4) obtain *Brady* materials; (5) review the redacted video tape of petitioner's statement to law enforcement; and (6) effectively cross-examine the prosecution's witnesses.[13]  *Id.*

To establish that counsel was constitutionally ineffective, a petitioner must demonstrate (1) "that counsel's performance was deficient" and (2) "that the deficient performance prejudiced the defense."  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To prove deficiency, "a person . . . must show that 'counsel's representation fell below an objective standard of reasonableness.'"  *Harrington v. Richter*, 562 U.S. 86, 104 (2010) (quoting *Strickland*, 466 U.S. at 688).  Under the second prong, "a [petitioner] must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  *Lafler v. Cooper*, 566 U.S. 156, 163 (2012) (quoting *Strickland*, 466 U.S. at 694).  "A reasonable probability is a probability sufficient to undermine

---

[12]   Respondent argues that portions of petitioner's ineffective assistance of counsel claim are unexhausted, while others are procedurally barred due to independent and adequate state law grounds.  Dkt. No. 20-1 at 44-46.  Because the undersigned has determined that they are clearly meritless, the procedural arguments will not be further discussed.

[13]   Initially petitioner also included sub-claims that his counsel was ineffective for failing to redact petitioner's prior testimony – delegating the responsibility to the prosecutor instead – and making improper and ineffective remarks during his summation.  Dkt. No. 3 at 33-34.  For the reasons previously stated, petitioner withdrew these sub-claims; accordingly, the undersigned will not further consider them.  Dkt. No. 26 at 34, 39.

confidence in the outcome." *Strickland*, 466 U.S. at 694.  An ineffective assistance of counsel claim must be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs.  *See Strickland*, 466 U.S. at 697 (explaining courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

"Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).  "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Harrington*, 562 U.S. at 105.  When evaluating an ineffective assistance claim on habeas review, "the question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect[,] but whether that determination was unreasonable – a substantially higher threshold." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro*, 550 U.S. at 473) (internal quotations omitted).  Therefore, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 562 U.S. at 105.

### i.    Failure to Investigate the Case

Petitioner first contends that his counsel was ineffective because counsel "failed to contact a number of expert witnesses that would have provided exculpatory evidence[.]"  Dkt. No. 3 at 27.  Specifically, petitioner claims that the treating emergency room doctor at the Cortland Hospital should have been contacted because he "did a CAT scan of [the victim] 8 hours after [the] incident and then administered a dose of Vicoden, a fact no ER doctor would do if [the victim] suffered a concussion."  Dkt. No. 3 at 27.  Further, petitioner argues that he "was able to find a forensic pathologist (Dr. Terzian) who gave an opinion as to [the] markings

or lack [there] of . . . [on the victim's body and h]is professional opinion, on his letterhead, was no ligature marks were present from a rope or any other type of devi[c]e." Dkt. No. 3 at 28. Petitioner also asserted in his reply that another expert which he found, Dr. Klepack's, answers to petitioner's questions undermine the severity of the victim's physical injury, specifically her concussion. In sum, petitioner concludes that the "[j]ury based their physical injury judgment on [the victim] having a concussion and not anything else and this is prejudice as minor slaps or bruises do not qualify as [a] physical injury." Dkt. No. 26 at 30.

The Supreme Court "ha[s] often explained that strategic decisions – including whether to hire an expert – are entitled to a strong presumption of reasonableness . . . [because d]efense lawyers have limited time and resources, and so much to choose from among countless strategic options." *Dunn v. Reeves*, 594 U.S. 731, 739 (2021) (internal quotation marks and citations omitted). This decision is further complicated by "the risk of harming the defense by undermining credibility with the jury or distracting from more important issues." *Id.* (internal quotation marks, alterations and citations omitted).

Here, petitioner has failed to rebut the strong presumption that his counsel's actions in failing to hire an expert are a strategic decision entitled to deference. First, petitioner has failed to show what benefit hiring either of these physicians as experts or interviewing the physician from the Cortland Hospital would be to his defense. Petitioner is engrossed in the fact that the victim was not immediately diagnosed with a concussion. However, that was not a pivotal issue in this case. Neither was the visible presence or absence of marks on her wrist. Those discrete issues do not otherwise negate the trauma the victim suffered, due to repeated physical and sexual assaults, which was presented to the jury through the testimony of the victim, various medical professionals, and law enforcement officers.

Second, while petitioner demonstrates confidence in what Drs. Terzian and Klepack would have testified to, it is unclear what either individual would have said which would have been beneficial to his cause.  While there were letters presented to the state court, it is important to stress what the 440 court noted, neither letter represented a sworn statement from either individual.  Moreover, it does not appear that the information in Dr. Klepack's letter is inconsistent with the victim's testimony and Dr. Crepet's diagnosis.  Specifically, the victim was diagnosed with post-concussive syndrome approximately two weeks after her first doctor's visit, which is consistent with Dr. Klepack's statement that such symptoms may take time to develop after the injury.  Further, the absence of any diagnosis during that two-week period does not negate the symptoms of pain, headache, dizziness, and nausea that the victim continually reported to the medical professionals she saw or their efforts to help alleviate or manage those symptoms with various pharmaceuticals.   "Petitioner's speculation as to . . . how an expert witness may have testified [is] wholly insufficient to satisfy *Strickland*." *Santana v. Bell*, No. 9:20-CV-1098 (TJM/ML), 2023 WL 6737931, at *18 (N.D.N.Y. Aug. 14, 2023) (citing cases).  In sum, "second-guessing trial counsel's decision about retaining an expert witness is exactly the type of strategic choice about which courts reviewing habeas petitioner have been cautioned." *King v. Griffin*, No. 9:17-CV-0321(MAD), 2018 WL 1940419, at *12 (N.D.N.Y. Apr. 23, 2018) (citing *Greiner v. Wells*, 417 F.3d 305, 323 (2d Cir. 2005)).

Petitioner also argues that counsel was ineffective for failing to interview Chiefs Barber and Watkins, neither of whom were called as witnesses as trial.  Petitioner explained that Chief Barber was not just there to listen, but instead was actively involved in the investigation, as demonstrated by his actions of telling the victim what to put in her statement and directing

the officers where to find evidence in the victim's household.  Dkt. No. 26 at 30-31.  However there is no proof to support petitioner's self-serving argument.  Moreover, if Chief Barber's support led the victim to provide a more accurate and complete accounting of the assault she suffered as the result of petitioner's actions, the fact that the victim's unfettered honesty subjects him to harsher criminal penalties for his actions is not a constitutional violation.  The prejudice that petitioner claims to have suffered, being exposed to a more serious punishment, is not due to Chief Barber's advocacy, it is due to his own actions.

Further, petitioner believes Chief Watkins could challenge the victim's credibility and demonstrate that she was "less than truthful on the stand." *Id.* at 31.  However, petitioner fails to articulate how or why.  In sum, petitioner has failed to demonstrate why counsel's failure to interview these individuals was deficient or how it affected the outcome of his trial.

### ii.    Failure to File Proper Motions

Petitioner next contends that his counsel was ineffective because he failed to file adequate motions with relevant case law, thus, the motions were deemed frivolous and denied by the court.  Dkt. No. 3 at 29.  Petitioner relies on the fact that none of the motions which were put forward by his trial counsel were granted as irrefutable proof of the unconstitutional quality of petitioner's representation.  *Id.*

However, petitioner fails to specify what these motions were, what evidence counsel should have been able to obtain or suppress (assuming a proper motion was filed), and how the outcome of his trial would have been different.  Petitioner states that he "went to great lengths to show what motions were inadequate in [his 440] motion pages," listing topics like the trial judge ruling his trial counsel's motions were frivolous and requests for Dr. Crepet's and the psychologist's notes, as well as the victim's phone records.  Dkt. No. 26 at 31.

Despite petitioner's emphatic rebuttal, his allegations still rely on vague and conclusory arguments which are insufficient to establish ineffective assistance.  *See Scott v. Racette*, No. 1:15-CV-0043, 2018 WL 451825, at *7 (W.D.N.Y. Jan. 17, 2018) (collecting cases). Further, petitioner's failure to "allege why such motions would have been arguably meritorious" and demonstrate how "the verdict would have been different if such motions were filed" is fatal to his claim.  *DeLee v. Graham*, No. 9:11-CV-0653 (MAD/CFH), 2013 WL 3049109, at *23 (N.D.N.Y. June 17, 2013).

### iii.    Failure to Seek a Limiting Jury Instruction

Petitioner then argues that his counsel should have requested that the trial court issue limiting instructions regarding the text message that he sent to his sister telling her not to tell anyone that he and the victim had had sex.  Dkt. No. 3 at 30.  Specifically, petitioner contends that his counsel should have asked the trial court to instruct the jury not to consider the content of the text message as the truth of the matter and as evidence of his guilt.  Dkt. No. 26 at 31.

A limiting instruction is issued where evidence needs to be narrowed to "its proper function."  *Spencer v. State of Texas*, 385 U.S. 554, 562 (1967).  However, contrary to petitioner's argument, there is no legal basis for such an instruction in this instance. "[E]vidence is relevant if it tends to prove the existence or nonexistence of a material fact, i.e., a fact directly at issue in the case."  *People v. Primo*, 96 N.Y.2d 351, 355 (2001).  Further, "[c]ertain postcrime conduct is indicative of a consciousness of guilt, and hence of guilt itself." *People v. Bennett,* 79 N.Y.2d 464, 469 (1992).  In fact, "equivocal consciousness-of-guilt evidence may be admissible so long as it is relevant, meaning it has a tendency to establish the fact sought to be proved – that [petitioner] was aware of guilt."  *Id.* at 470.

47

Here, the text message was relevant evidence, as it proved that petitioner had sexual intercourse with the victim on the night of the attack. Further, it demonstrated petitioner's consciousness of guilt, because he asked his sister to keep the information a secret or else he could be at risk of a rape charge. Petitioner has not established, nor has the undersigned discovered, any need for the jury to consider the message's substance through a narrower scope. Because the trial court would not have granted a motion for a limiting instruction, petitioner's counsel cannot be deemed ineffective for refusing to make a meritless motion. *See United States v. Noble*, 363 F. App'x 771, 773 (2d Cir. 2010) (citations omitted).

### iv.    Failure to Obtain *Brady* Material

Petitioner essentially refers to his first claim, concluding that his trial counsel's performance was ineffective because his counsel failed to obtain the alleged exculpatory materials that petitioner claims were withheld from his defense. Dkt. No. 3 at 30; Dkt. No. 26 at 32.

As previously explained, petitioner has failed to allege that any *Brady* violations occurred. To the extend that petitioner sought photographs of the victim's room, they were provided to petitioner's trial counsel and submitted as exhibits during the trial. There is no evidence to assume that a second set of photographs of the victim's room exists. Similarly, there is no evidence to establish that Dr. Crepet's handwritten notes were not duplicative of the several days of medical treatment notes that were also admitted as exhibits during the trial. Moreover, petitioner failed to establish that Chief Barber had created any notes during his tangential involvement in the case.

With respect to the identity of the victim's veterinarian, petitioner's counsel attempted to glean that information during cross-examination and further challenged the issue in the

state courts. The fact that the information was elusive was noted by the state courts, there was not a practice in Dryden with the name that the victim provided. Therefore, the identity remained a mystery to all parties, which was consistent with the victim's testimony that she was unsure of who the veterinarian was. Further, petitioner failed to indicate how knowing the identity of the veterinarian or having the victim's cell phone records would have benefitted his defense.

In sum, because petitioner was either provided with the disputed material or its provision did not otherwise benefit his defense, he was unable to prove that his *Brady* claims were meritorious. Similarly, petitioner is unable to prove that his trial counsel was acting deficiently for failing to move for, or ultimately secure, this information.

### v.   Failure to Review the Redacted Videotape of Petitioner's Statement

Petitioner also argues that his counsel's performance was constitutionally deficient because he allowed the prosecutor to redact portions of the recording of his police interview and corresponding transcript. Dkt. No. 3 at 30. Petitioner's counsel was provided an opportunity to review the redacted tape over a one hour lunch break; however, petitioner contends that performing a thorough review of the two hour tape was impossible in the allocated time and concludes that the prosecutor "was allowed to delete what they wanted out of the tape with no opposition," and permit the inclusion of "[s]everal exculpatory statements [which] . . . severely prejudiced [petitioner.]" *Id.*

Petitioner's recitation of the facts surrounding this claim are misleading. First, the trial court heard a detailed discussion, from both parties, about their collaborative efforts to focus on the relevant portions of petitioner's recorded interview and corresponding transcript.[14] T.

---

[14] The prosecution explained that there were "long parts [of the video] where nobody is saying anything," so he was able to insert bookmarks into the viewing software to skip to the relevant portions of the recording. T. 930-31, 935-36.

930-39.  The entire video recording was, as petitioner represented, two hours long.  T. 930.

However, given the parties' collaboration in deciding what portions of the video were going to

be skipped and what sections of the transcript were omitted, it is fair to assume that

petitioner's trial counsel was intimately familiar with the entire video.  Petitioner fails to

provide any evidence that his trial counsel was unaware of what the abridged video depicted.

Further, the portion that was shown in open court was 53 minutes; therefore, there is no

reason to believe that petitioner's trial counsel failed to watch the video, in its entirety, on the

lunch break as indicated.  T. 933-36, 939.  Moreover, because petitioner's trial counsel was

already aware of the unabridged version of the video, there is also no reason to believe that

he would have had to review that video simultaneously with, or concurrent to, the copy

intended for publication during the trial.  Further, the video was played in open court, while

the petitioner and his counsel were watching, and the jury did not have access to video or the

corresponding transcript outside of the courtroom.  T. 933-36.  Accordingly, petitioner fails to

demonstrate how prejudicial evidence was admitted against him or favorable evidence was

improperly excluded.  *See Vasquez v. New York,* No 1:17-CV-0697, 2020 WL 2859007, at

*11 (S.D.N.Y. Feb. 27, 2020) (alternatively denying petitioner's ineffective assistance claims

because "he does not identify any actions that [his] counsel failed to take.").  Further,

petitioner fails to indicate how the outcome of the trial would have been different had his trial

counsel manipulated the video and transcript for the trial.  *Id.*  Instead, it appears that his

counsel skillfully advocated for petitioner by collaborating with the prosecution.

### vi.    Failure to Effectively Cross-Examine Prosecution Witnesses

Petitioner also argues that his counsel was constitutionally ineffective for failing to

further probe into several inconsistencies petitioner noted (1) between the victim and police

about where evidence was located; (2) from the victim about her injuries; (3) about

petitioner's mode of entry into the victim's home; (4) about details in the photographs of the

victim's bedroom; (5) about the coherence of the petitioner; (6) between various medical

professionals about whether the victim immediately suffered the effects of a concussion; (7)

about the level of the victim's perceived pain; and (8) regarding the reported order of events

during the alleged attack.  Dkt. No. 3 at 31-32.  It appears that petitioner's position is that

each of these examples represents something greater than a minor inconsistency that would

have significant bearing on the outcome of his trial.

      However, the undersigned disagrees.  As this Court has already held:

> [T]he Second Circuit has explained, counsel's decisions about "whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature."  *United States v. Nersesian*, 824 F.2d 1294, 321 (2d. Cir. 1987), *cert. denied*, 484 U.S. 958 (1987); *see also United States ex rel. Walker v. Henderson*, 492 F.2d 1311, 1314 (2d Cir. 1974) ("the decision to call or bypass particular witnesses is peculiarly a question of trial strategy ... which courts will practically never second-guess.") (first citing *United States v. Matalon*, 445 F.2d 1215, 1219 (2d Cir. 1971), *cert. denied*, 404 U.S. 853 (1971); then citing *United States v. Garguilo*, 324 F.2d 795, 797 (2d Cir. 1963)), *cert. denied*, 417 U.S. 972 (1974).
>
> Such "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]"  *Strickland*, 466 U.S. at 690.  Moreover, neither Petitioner's disagreement with counsel's strategic decision nor that the strategy utilized was unsuccessful are sufficient to prove counsel was ineffective.  *See Lalonde v. Thomas*, No. 9:20-CV-1561 (GTS), 2022 WL 1303918, at *19 (N.D.N.Y. May 2, 2022) ("While a petitioner may disagree with trial counsel's strategy, counsel is not ineffective merely because a strategy he/she employed was unsuccessful.") (collecting cases); *Backus v. Nichols*, No. 9:04-CV-0356 (TJM/GHL), 2008 WL 413295, at *12 (N.D.N.Y. Feb. 13, 2008) ("[t]o the extent [the petitioner]'s claim suggests a disagreement with counsel's strategy, '[a] petitioner cannot prevail on a claim of ineffective assistance merely because he disagrees with his counsel's strategy.' ") (quoting *Bussey v.*

> *Greiner*, No. 1:02-CV-8642, 2007 WL 2589454, at *8 (S.D.N.Y.
> Aug. 28, 2007)) (additional citation omitted).

*White-Span v. Corey*, No. 9:21-CV-1292 (DNH), 2024 WL 81406, at *16 (N.D.N.Y. Jan. 8,

2024), *appeal dismissed,* No. 24-350, 2024 WL 3745541 (2d Cir. July 26, 2024).  The same

holds true here.  Petitioner's retrospective disagreement with the way that his counsel utilized

prior testimony and physical evidence to cross-examine all the witnesses during the course of

the trial is not sufficient to deem his representation constitutionally ineffective.

### G.    Claim Seven: Prosecutorial Misconduct[15]

Finally, petitioner contends that he was denied a fair trial because of prosecutorial

misconduct.  Dkt. No. 2 at 19-20.  Specifically, petitioner argues that the prosecutor (1)

knowingly introduced false and perjurious testimony from the victim, Officer Tagliavento, and

Dr. Crepet; (2) failed to identify witnesses for the defense, specifically the "psychologist who

made [the] call requesting more medication . . . be prescribed to [the victim];" (3) erred by

introducing petitioner's unredacted testimony from the first trial; and (4) committed *Brady*

violations.  *Id.*

#### i.    Perjured Testimony

The Supreme Court has "noted the well-established rule that a conviction obtained by

the knowing use of perjured testimony is fundamentally unfair[.]"  *United States v. Bagley*,

473 U.S. 667, 679 (1985) (internal quotation marks and citations omitted).  Accordingly, a

"conviction must be set aside if (1) the prosecution knew, or should have known, of the

perjury, and (2) there is any reasonable likelihood that the false testimony could have

affected the judgment of the jury."  *Drake v. Portuondo*, 321 F.3d 338, 345 (2d Cir. 2003)

---

[15]  Respondent argues that portions of petitioner's prosecutorial misconduct claim are unexhausted.  Dkt. No. 20-1 at 54. Because the undersigned has determined that they are clearly meritless, the procedural arguments will not be further discussed.

(internal quotation marks and citations omitted).  "A witness commits perjury if he gives false

testimony concerning a material matter with the willful intent to provide false testimony, as

distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory."

*United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001) (citing *United States v.*

*Dunningan*, 507 U.S. 87, 94 (1993)).  Consequently, "[s]imple inaccuracies or inconsistencies

in testimony do not rise to the level of perjury."  *Monteleone*, 257 F.3d at 219 (citations

omitted).

Petitioner has failed to satisfy this standard.  First, petitioner has not demonstrated that

the prosecution witnesses have testified falsely.  Instead, petitioner, at best, relies on

numerous instances of discrete inconsistencies between testimony and statements taken at

different times and, at worst, misconstrues information and asserts that it is false.  Petitioner

starts with the example of Officer Tagliavento and the photographs in the victim's bedroom.

Dkt. No. 26 at 36.  As previously discussed, Tagliavento's testimony – that he did not

personally take photographs of the victim's bedroom and was, instead, charged with taking

pictures of the perimeter of the victim's home – was not inconsistent with the police report

that he secured the photographs of the victim's bedroom.  Further, there was no evidence

presented that Tagliavento lied, as petitioner alludes, and took a second set of photographs

of the bedroom which were never disclosed to him.  Because there was no false testimony,

there is no way that petitioner can demonstrate perjury or prosecutorial misconduct.

The same is true of petitioner's claims about the victim's inconsistent reports of her

pain level and whether her symptoms should have resulted in the prescriptions that she was

provided or the diagnosis of a concussion.  Dkt. No. 37-38.  The petitioner's physical

condition, as well as her comfort level with sharing the extent and cause of her injuries, was a

53

fluid situation.  There are several different entries from medical providers and law

enforcement documenting those exchanges.  The fact that her subjective assessment of her

situation slightly varied is understandable, and not an indication of a willful lie about a

material matter.  Further, these slight inconsistencies have little impact with the reality that

different professionals will record slightly different observations and opinions about a patient's

condition.  As discussed above, several of the medical professionals had fairly consistent

opinions about what symptoms would qualify as a concussion and what treatment would be

appropriate.  Accordingly, petitioner has failed to establish the first element required for

prosecutorial misconduct based on alleged perjured testimony.

> ### ii.    Failure to Identify a Witness & Introduction of Petitioner's Trial Testimony

Petitioner claims that the prosecution's failure to identify the medical

professional who prescribed medication for the victim's symptoms immediately after the

attack – believed to be a psychologist -- was prosecutorial misconduct.  Dkt. No. 2 at 19.

Further, petitioner contends that there was prosecutorial misconduct because the prosecution

was improperly allowed to introduce petitioner's prior trial testimony, instead of respecting

petitioner's constitutional right to remain silent.  *Id.*

It is unclear to the undersigned how either of these situations could be perceived as

prosecutorial misconduct.  The Supreme Court has cautioned that "ordinary trial error of a

prosecutor . . . [is insufficient] to amount to a denial of constitutional due process."  *Donney v.*

*DeChristoforo*, 416 U.S. 637, 646-47 (1974).  Conversely, where there is "egregious

misconduct" like "introduc[ing] . . . specific misleading evidence important to the prosecution's

case in chief []or the nondisclosure of specific evidence valuable to the accused's defense," a

constitutional violation has occurred.  *Id.*; *see also Garofolo v. Coomb*, 804 F.2d 201, 206 (2d

Cir. 1986) (concluding "that constitutional error occurs only when the prosecutorial remarks were so prejudicial that they rendered the trial in question fundamentally unfair.").

Here, there does not appear to be either trial error or egregious misconduct. With respect to the identity of the medical professional who prescribed the victim medication to treat her symptoms, petitioner fails to demonstrate how the nondisclosure of that individual was valuable to his defense. As was previously discussed, this individual was tangential to the case, as was the conversation about whether the victim immediately suffered from a concussion and was appropriately prescribed particular types of pain medication for her reports of pain, swelling, and other discomfort. The conversations that did or did not occur between Dr. Crepet and this other medical professional are, at best, marginally relevant to the petitioner's defense. This conversation does not represent anything that would be of significant value to the jury in the decision on whether or not petitioner was guilty of burglary and rape. Being most generous to petitioner, the worst that this nondisclosure could be categorized as was a trial error. However, it cannot be deemed egregious misconduct.

Even less indicative of misconduct is the inclusion of petitioner's prior trial testimony into the record. Here, there was a joint decision by both the prosecutor and petitioner's trial counsel to read in petitioner's prior trial testimony with agreed-upon redacted portions. T. 1048-49. Because this was a consensual decision, that was not objected to, the undersigned cannot see where there is any hint of misconduct. Accordingly, petitioner's claims are meritless.

### iii.    *Brady* Violations

Petitioner finally contends that prosecutorial misconduct occurred when the prosecutor failed to disclose the *Brady* material that was the basis of his First Claim. As previously

discussed, this claim lacks merit.  Therefore, petitioner's further assertions of prosecutorial misconduct also lack merit.  Accordingly, they are denied.

## V.    CONCLUSION

**WHEREFORE**, it is

**ORDERED** that the petition, Dkt. No. 1, is **DISMISSED AND DENIED**; and it is further

**ORDERED** that the Court declines to issue a Certificate of Appealability.  28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003))).  Any further request for a Certificate of Appealability must be addressed to the Court of Appeals.  *See* Fed. R. App. P. 22(b); 2d Cir. R. 22.1.

**ORDERED** that the Clerk serve a copy of this Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

Dated:  July 1, 2025
         Albany, New York

Mae A. D'Agostino
U.S. District Judge